Filed 10/18/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B315434 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A893110) |
| v. | |
| TONY HARDIN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Juan C. Dominguez, Judge. Reversed and remanded with directions.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Nima Razfar, Deputy Attorney General, for Plaintiff and Respondent.

———————————

An individual convicted of a controlling offense committed before the person was 18 years old and for which the sentence is life without the possibility of parole is eligible for release on parole at a youth offender parole hearing at the beginning of the 25th year of incarceration.  (Pen. Code, § 3051, subd. (b)(4).)[1] Similarly, with several exceptions, an individual convicted of a controlling offense committed when the person was a young adult, 25 years old or younger, and for which the sentence is an indeterminate state prison term of 25 years to life, including first degree premeditated murder, is eligible for release on parole at a youth offender parole hearing at the beginning of the 25th year of incarceration.  (§ 3051, subd. (b)(3).)  However, an individual who received a sentence of life without the possibility of parole for an offense committed after attaining the age of 18 is not eligible for a youth offender parole hearing (§ 3051, subd. (h)) or otherwise entitled to parole consideration.

Tony Hardin, convicted in 1990 of special-circumstance felony murder for a crime committed when he was 25 years old, contends it violates his right to equal protection under the Fourteenth Amendment to exclude him from youth offender parole consideration, while a 17-year-old who committed special-circumstance murder and a young adult who committed first degree premeditated murder when 25 years old or younger but was convicted of the crime without a special-circumstance finding are entitled to such consideration.  As a consequence, he argues, the trial court erred in denying his motion for a *Franklin*

---

[1]    Statutory references are to this code.

2

hearing[2] to assemble information concerning youth-related mitigating factors for an eventual youth offender parole hearing.

This statutory scheme's tension with the rationale of the United States Supreme Court decisions in *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*) and *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*) has been widely recognized. (See, e.g., *In re Murray* (2021) 68 Cal.App.5th 456, 464; *People v. Acosta* (2021) 60 Cal.App.5th 769, 780-781; *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1036 (conc. opn. of Segal, J.); *In re Jones* (2019) 42 Cal.App.5th 477, 486-487 (conc. opn. of Pollak, P. J.); see also *People v. Montelongo*, Liu, J., concurring in denial of petition for review, Jan. 27, 2021, S265597.)[3] Although it is

---

[2] Recognizing that gathering information on youth-related mitigating factors for a youth offender parole hearing is a task more easily accomplished at the time of sentencing rather than decades later at a parole hearing, the Supreme Court in *People v. Franklin* (2016) 63 Cal.4th 261, 283-284 held a defendant eligible for such a hearing must be permitted at the time of sentencing to make a record of those factors, a proceeding that has since become known as a *Franklin* proceeding. The Court in *In re Cook* (2019) 7 Cal.5th 439, 458 held a juvenile offender with a final judgment could move in a postjudgment proceeding under section 1203.01 (rather than through a petition for a writ of habeas corpus) to present evidence of youth-related factors.

[3] A constitutional challenge to one aspect of section 3051, subdivision (h)'s exclusion of young adults from youth offender parole consideration is currently pending in the Supreme Court. In *People v. Williams*, review granted July 22, 2020, S262229, the Court limited briefing and argument to the following issue: "Does Penal Code section 3051, subdivision (h), violate the equal protection clause of the Fourteenth Amendment by excluding young adults convicted and sentenced for serious sex crimes under the One Strike law (Pen. Code, § 667.61) from youth

arguably unsound as a matter of policy to adhere to the bright line rule articulated in *Roper v. Simmons* (2005) 543 U.S. 551, the Legislature acted rationally in deciding that individuals sentenced to life without parole for a special-circumstance murder committed while still a minor (16 or 17 years old) were entitled to a youth offender parole hearing but young adults who committed the same offense after turning 18 were not.

The same analysis does not support the Legislature's distinction for purposes of section 3051 between young adult offenders who committed a special-circumstance murder and were sentenced to life without parole and other young adult offenders who committed different serious or violent crimes and received parole-eligible indeterminate life terms, including those that could be the functional equivalent of a life without parole sentence. The purpose of the current iteration of section 3051 generally providing youth offender parole hearings for individuals convicted of a controlling offense committed when the person was 25 years old or younger is that the distinctive attributes of youth—transitory mental traits and environmental vulnerabilities—which the Supreme Court in *Miller* recognized mitigate culpability and offer the possibility of growth and change, apply equally to young adults up to age 25. Having made that determination, there was no rational basis for the Legislature to exclude otherwise similarly situated offenders from any opportunity for a youth offender parole hearing based solely on the crime committed or the sentence imposed, factors

offender parole consideration, while young adults convicted of first degree murder are entitled to such consideration?"

unrelated to a determination the offender is "irreparably corrupt."

The Legislature exercising its authority to define crimes and fix the penalties, of course, may in the future decide the youth parole eligibility date for a young adult convicted of special-circumstance murder and sentenced to life without parole should be different from the first day of the person's 25th year of incarceration, as now provided in section 3051, subdivision (b)(3), for those serving an indeterminate state prison term of 25 years to life for the controlling offense. But Hardin is entitled to a youth offender parole hearing and a meaningful opportunity to be released on parole at some point and, as such, is also entitled to a *Franklin* hearing to assemble information concerning his youth-related mitigating factors.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Hardin's Conviction for the Murder of Norma Barber and Sentence to Life Without Parole*

In 1989, when he was 25 years old, Hardin killed his neighbor Norma Barber while stealing jewelry and other items from her apartment and her car. In 1990 a jury convicted Hardin of first degree murder (§ 187) and found true the special-circumstance allegation the murder had been committed during the commission of a robbery (§ 190.2, subd. (a)(17)). The jury also found Hardin guilty of inflicting great bodily injury on a person 60 years of age or older (§ 1203.09, subd. (a)), residential robbery (§ 211) and grand theft of an automobile (§ 487, subd. (c)). The trial court sentenced Hardin to a state prison term of life without

parole for the special-circumstance murder.[4]  We affirmed the judgment on appeal.  (*People v. Hardin* (July 19, 1993, B051873) [nonpub. opn.].)

      2.  *Hardin's* Franklin *Motion*

      On August 18, 2021 Hardin, representing himself, filed a motion seeking to develop a record for an eventual youth offender parole hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*) and *In re Cook* (2019) 7 Cal.5th 439.  In his motion Hardin argued section 3051, subdivision (h), violated the equal protection clause of the Fourteenth Amendment by denying the right to a youth offender parole hearing to inmates sentenced to life without the possibility of parole for crimes committed between the ages of 18 and 25 while authorizing youth offender parole hearings for individuals who committed first degree murder and received a sentence of 25 years to life (that is, without the additional true finding on a special-circumstance allegation).  The trial court denied Hardin's request for a *Franklin* hearing because Hardin was statutorily ineligible for a youth offender parole hearing, ruling section 3051, subdivision (h), was "not unconstitutional as applied to persons sentenced to life without the possibility of parole."

      Hardin filed a timely notice of appeal.

---

[4]     Pursuant to section 654 the trial court stayed the sentences imposed on the remaining counts.

## DISCUSSION

1. *Indeterminate Life Sentencing and Youth Offender Parole Hearings*

In *Roper v. Simmons*, *supra*, 543 U.S. 551 the United States Supreme Court held the Eighth Amendment's ban on the infliction of cruel and unusual punishment categorically prohibited imposition of the death penalty on juvenile offenders, defined as youths under the age of 18. (*Id*. at pp. 568-569.) Five years later in *Graham*, *supra*, 560 U.S. 48 the Supreme Court, emphasizing a juvenile offender's "capacity for change and limited moral culpability," held it violated the Eighth Amendment to impose a sentence of life without parole on a juvenile offender who had not committed homicide. (*Id*. at p. 74.)

Two years after *Graham,* in *Miller*, *supra*, 567 U.S. 460 the Supreme Court extended the reasoning of its prior decisions to hold it also violated the Eighth Amendment to impose a mandatory life without parole sentence on a juvenile convicted of murder because that mandatory penalty "precludes consideration of [the juvenile's] chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to

7

assist his own attorneys." (*Miller*, at pp. 477-478.)[5]  A sentence of life without parole on a juvenile that fails to take these youth-related mitigating factors into account, the Court held, violates the Eighth Amendment prohibition on cruel and unusual punishment.  (*Ibid.*; accord, *Montgomery v. Louisiana* (2016) 577 U.S. 190 (*Montgomery*).)

Shortly after the decision in *Miller*, the California Supreme Court held in *People v. Caballero* (2012) 55 Cal.4th 262 that the Eighth Amendment analysis in *Graham* also applied to sentences that are the "functional equivalent of a life without parole sentence," including Caballero's term of 110 years to life.  (*Id.* at p. 268.)

To bring juvenile sentencing in California into conformity with *Graham*, *Miller* and *Caballero*, the Legislature in Senate Bill No. 260 (2013-2014 Reg. Sess.) (Stats. 2013, ch. 312, §§ 4, 5), effective January 1, 2014, added sections 3051 and 4801, subdivision (c), to the Penal Code, providing for youth offender parole hearings at which youth-related mitigating factors are to be considered.  (*Franklin*, *supra*, 63 Cal.4th at p. 277; accord,

---

[5]  *Miller* identified three significant differences between juveniles and adults that bear on culpability.  "First, children have a "'lack of maturity and an underdeveloped sense of responsibility,'" leading to recklessness, impulsivity, and heedless risk-taking.  [Citation.]  Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings.  [Citation.]  And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'" (*Miller, supra*, 567 U.S. at p. 471.)

8

*People v. Ochoa* (2020) 53 Cal.App.5th 841, 848.)  Section 3051
initially applied to offenses committed before the offender turned
18 years old and required the Board of Parole Hearings with
certain limited exceptions to conduct a youth offender parole
hearing no later than a juvenile offender's 25th year of
incarceration (and at earlier points depending on the offender's
"controlling offense").[6]  (See *Ochoa*, at p. 848.)  New section 4801,
subdivision (c), directed the Board of Parole Hearings, when
considering parole eligibility for youth offenders, to "give great
weight to the diminished culpability of juveniles as compared to
adults, the hallmark features of youth, and any subsequent
growth and increased maturity."[7]  As originally enacted former
section 3051, subdivision (h), expressly excluded from eligibility
for a youth offender parole hearing cases in which sentencing was
pursuant to the three strikes law (§§ 667, subds. (b)-(i), 1170.12),
the one strike law (§ 667.61) "or in which an individual was

---

[6]      "Controlling offense" is defined in section 3051,
subdivision (a)(2)(B), as "the offense or enhancement for which
any sentencing court imposed the longest term of imprisonment."

[7]      As originally enacted, section 4801, subdivision (c), like
section 3051, applied to a prisoner who had committed his or her
controlling offense before attaining the age of 18.  As the
Legislature increased the eligibility age for a youth offender
parole hearing, it also increased the age specified in section 4801,
subdivision (c), for consideration of youth-related mitigating
factors at parole hearings.  However, the mandate that the Board
consider those factors applies to all parole hearings for a prisoner
who committed his or her controlling offense at an eligible age,
not just to offenders being considered for parole eligibility at a
youth offender parole hearing.  (See *People v. Delgado* (2022)
78 Cal.App.5th 95, 103-104.)

sentenced to life in prison without the possibility of parole." (Stats. 2013, ch. 312, § 4.)

Sections 3051 was subsequently amended to apply to offenders who had committed the controlling offense before the age of 23 (Stats. 2015, ch. 471, § 1) and then to offenders who committed the controlling offense when 25 years old or younger (Stats. 2017, ch. 684, § 1.5). In addition, in the 2017 legislation raising the threshold age to 25, the Legislature extended youth parole hearings in the 25th year of incarceration to juveniles sentenced to life without the possibility of parole for a controlling offense committed before the age of 18. (§ 3051, subd. (b)(4), added by Stats. 2017, ch. 684, § 1.5; see *People v. Contreras* (2018) 4 Cal.5th 349, 381.) Section 3051, subdivision (h), was amended to limit the exclusion of individuals sentenced to life in prison without parole to cases in which the sentence was imposed for a controlling offense committed "after the person had attained 18 years of age." (Stats. 2017, ch. 684, § 1.5.) The amendments authorizing youth parole hearings for minors sentenced to life without parole were designed to "bring California into compliance with the constitutional requirements of *Miller* and *Montgomery*," which held *Miller*'s prohibition on mandatory life without parole sentences for juvenile offenders was retroactive to juvenile offenders whose convictions and sentences were final when *Miller* was decided. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017-2018 Reg. Sess.) Mar. 21, 2017, p. 4.) The legislation sought "to remedy the now unconstitutional juvenile sentences of life without the possibility of parole," without the need for "a resentencing hearing, which is time-consuming, expensive, and subject to extended appeals." (*Id.* at p. 3; see *People v. Acosta*, *supra*, 60 Cal.App.5th at p. 777.)

10

2. *Equal Protection Review*

Both the federal and California Constitutions guarantee that no person shall be denied the equal protection of the laws. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.) "The concept of equal treatment under the laws means that persons similarly situated regarding the legitimate purpose of the law should receive like treatment." (*People v. Morales* (2016) 63 Cal.4th 399, 408; accord, *Engquist v. Oregon Dept. of Agriculture* (2008) 553 U.S. 591, 602 ["[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being 'treated alike, under like circumstances and conditions'"]; see *People v. Chatman* (2018) 4 Cal.5th 277, 289 ["our precedent has not distinguished the state and federal guarantees of equal protection for claims arising from allegedly unequal consequences associated with different types of criminal offenses"]; *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 [federal and state equal protection guarantees have similar interpretation].)

"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner. [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged. [Citation.] In other words, we ask at the threshold whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws." (*People v. Foster* (2019) 7 Cal.5th

11

1202, 1211-1212 [internal quotation marks omitted]; accord, *People v. Barrett* (2012) 54 Cal.4th 1081, 1107; see *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [to prevail on an equal protection challenge, a party must first establish that "'the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner'"].)  If the two groups are not similarly situated, there can be no equal protection violation. (*Barrett*, at p. 1107 ["[a] prerequisite to a meritorious claim is that individuals "'similarly situated with respect to the legitimate purpose of the law receive like treatment'"'"]; see *People v. Navarro* (2021) 12 Cal.5th 285, 346; *In re Lemanuel C.* (2007) 41 Cal.4th 33, 38.)

"The next step of an equal protection analysis asks whether the disparate treatment of two similarly situated groups is justified by a constitutionally sufficient state interest.  [Citation.] Varying levels of judicial scrutiny apply depending on the type of claim.  '[M]ost legislation is tested only to determine if the challenged classification bears a rational relationship to a legitimate state purpose.'  [Citation.]  However, differences 'in statutes that involve suspect classifications or touch upon fundamental interests are subject to strict scrutiny, and can be sustained only if they are necessary to achieve a compelling state interest.'"  (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1107; accord, *In re Smith* (2008) 42 Cal.4th 1251, 1262-1263.)

Under rational relationship review a classification or differential treatment is presumed valid "until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.  [Citations.]  The underlying rationale for a statutory classification need not have been ""ever actually articulated"" by lawmakers, and it does not need to ""be

empirically substantiated.'"" [Citation.] Nor does the logic behind a potential justification need to be persuasive or sensible—rather than simply rational." (*People v. Chatman*, *supra*, 4 Cal.5th at p. 289; see *Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2017) 3 Cal.5th 1118, 1140 [""a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification""]; *People v. Floyd* (2003) 31 Cal.4th 179, 189-190 [the Legislature can make "'a classification between groups differently situated, so long as a reasonable basis for the distinction exists'"].)

> 3. *Denying a Youth Offender Parole Hearing to Individuals Sentenced to Life Without Parole for Offenses Committed When They Were Between the Ages of 18 and 25 Violates Equal Protection*

Hardin contends (a) at least for purposes of section 3051, he is similarly situated to individuals who committed special-circumstance murder before they were 18 years old and were sentenced to life without parole and to individuals who committed first degree premeditated murder when they were between the age of 18 and 25 and were sentenced to state prison for 25 years to life, and (b) section 3051, subdivision (h), violates his constitutional right to equal protection because it deprives him of the same right to a youth offender parole hearing to which those individuals are entitled.[8]

---

[8] As discussed, in his motion for a *Franklin* hearing in the trial court, Hardin's equal protection challenge to section 3051, subdivision (h), was directed only to the distinction between

13

Effectively conceding rational basis review applies to the Legislature's decisions defining crimes and fixing sentences and penalties (see, e.g., *People v. Wilkinson* (2004) 33 Cal.4th 821, 838 [a defendant "'does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives'"]; *People v. Ward* (2008) 167 Cal.App.4th 252, 258 [applying rational basis review to a constitutional change to statutes imposing different penalties for possession for sale of cocaine base and cocaine powder]; *People v. Mitchell* (1994) 30 Cal.App.4th 783, 796 ["[d]etermining gradations of culpability . . . does not implicate the strict scrutiny test for equal protection purposes"]), Hardin maintains there is no rational basis for treating these groups differently because the Legislature has made a determination that all persons under the age of 26 are less culpable and more amenable to rehabilitation than those who committed the same offense after reaching the age of 26. We review this equal protection claim de novo. (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208; *People v. Montano* (2022) 80 Cal.App.5th 82, 114.)

---

individuals who had committed a special-circumstance murder when a young adult between the ages of 18 and 25 and those in that age group convicted of first degree murder without a special-circumstance finding. He did not address the distinction between juvenile offenders sentenced to life without parole and young adult offenders who received a life without parole sentence, as he does on appeal. The Attorney General does not contend Hardin forfeited this aspect of his equal protection argument.

a. *Distinguishing between juvenile and young adult offenders sentenced to life without parole does not violate equal protection*

The courts of appeal are not in agreement whether young adults convicted of special-circumstance murder are similarly situated to youth offenders who committed their controlling offense before they turned 18 years old.  (Compare, e.g., *People v. Acosta*, *supra*, 60 Cal.App.5th at p. 779 [similarly situated] with, e.g., *In re Jones* (2019) 42 Cal.App.5th 477, 481 [not similarly situated].)  We need not address that issue, however, because there is a rational basis for the Legislature's decision to treat these two groups differently.  (See, e.g, *In re Murray*, *supra,* 68 Cal.App.5th at p. 463 ["[e]ven if we assume petitioner has demonstrated that juvenile and youthful LWOP [life without parole] offenders are similarly situated, the claim must fail because petitioner has not demonstrated there is no rational basis for treating the two groups in an unequal manner"].)

As explained by our colleagues in Division Five of the First Appellate District in *People v. Sands* (2021) 70 Cal.App.5th 193, 204, "The Legislature had a rational basis to distinguish between offenders with the same sentence (life without parole) based on their age.  For juvenile offenders, such a sentence may violate the Eighth Amendment.  [Citations.]  But the same sentence does not violate the Eighth Amendment when imposed on an adult, even an adult under the age of 26. . . .  [T]he Legislature could rationally decide to remedy unconstitutional sentences but go no further."  (Accord, *People v. Acosta*, *supra*, 60 Cal.App.5th at pp. 779-780 ["Section 3051 now affords a youth offender parole hearing to juvenile LWOP offenders to comply with *Montgomery* without resorting to costly resentencing hearings.  [Citation.] The Legislature declined to include young adult LWOP offenders

15

in this amendment, presumably because *Montgomery* did not compel such treatment for young adults.  The Legislature thus had a constitutionally sufficient basis for distinguishing juvenile LWOP offenders from young adult LWOP offenders"]; see generally *Miller, supra*, 567 U.S. at p. 481 ["[w]e have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children"]; *Roper v. Simmons*, *supra*, 543 U.S. at p. 574 ["[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood"].)

As we said in a related context in *People v. Montelongo*, *supra*, 55 Cal.App.5th at page 1032, even if, as argued, "the line the United States Supreme Court created in *Roper* between juvenile and adult offenders is arbitrary and, at a minimum, should be extended to 19 or older, as '[s]cience determines' . . . [u]nless and until the United States Supreme Court, the California Supreme Court, the Legislature, or the voters by initiative change the law, we are bound to apply it."  Although the issue in *Montelongo* was whether the 19-year-old defendant's special-circumstance felony-murder life without parole sentence constituted cruel and unusual punishment in violation of the Eighth Amendment,[9] the same constraint applies to our equal protection analysis in the case at bar.

---

[9] We did not consider Montelongo's equal protection challenge to his sentence because he did not raise that argument until his reply brief.  (See *People v. Montelongo, supra*, 55 Cal.App.5th at p. 1030, fn. 8.)

16

b. *Young adult offenders sentenced to life without parole are similarly situated to all other young adult offenders for purposes of section 3051*

The issue with respect to section 3051's distinction between young adult offenders sentenced to life without parole and those of identical age sentenced to a parole-eligible life term, however, is quite different. To be sure, individuals who commit different offenses are not similarly situated for many purposes. (See, e.g., *People v. Descano* (2016) 245 Cal.App.4th 175, 182 ["'[p]ersons convicted of *different* crimes are not similarly situated for equal protection purposes'"]; *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1503 ["[p]ersons convicted of different offenses can be punished differently"]; see also *In re Williams* (2020) 57 Cal.App.5th 427, 435.) But the Supreme Court has cautioned, "[T]here is not and cannot be an absolute rule to this effect, because the decision of the Legislature to distinguish between similar criminal acts is itself a decision subject to equal protection scrutiny." (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199, overruled on another ground in *Johnson v. Department of Justice, supra*, 60 Cal.4th at p. 875; accord, *People v. Miranda* (2021) 62 Cal.App.5th 162, 182, review granted June 16, 2021, S268384 [the Supreme Court has "rejected the claim that individuals convicted of different crimes are *never* similarly situated"].)

As discussed, the pertinent question for equal protection analysis is whether the two groups are properly distinguishable for purposes of the law being challenged, even if they are dissimilar for other (or even most) purposes. (*People v. Barrett, supra*, 54 Cal.4th at p. 1107; *Cooley v. Superior Court, supra*, 29 Cal.4th at p. 253.) Section 3051 is decidedly not a sentencing statute. As amended in 2017 to expand its reach to young adult

17

offenders under the age of 26, its purpose was not to assess culpability or measure the appropriate level of punishment for various crimes, but "to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20's." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 198, citing Sen. Com. on Public Safety, Analysis of Sen. Bill No. 261 (2015-2016 Reg. Sess.) Apr. 28, 2015 [expanding eligibility to age 23]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1308 (2017-2018 Reg. Sess.) as amended Mar. 30, 2017 [expanding eligibility to age 25]; accord, *People v. Acosta*, *supra*, 60 Cal.App.5th at p. 779 ["'[t]he purpose of section 3051 is not to measure the extent of punishment warranted by the offense the individual committed but to permit the evaluation of whether, after years of growth in prison, that person has attained the maturity to lead a law-abiding life outside of prison'"].)

Viewed in light of section 3051's intended purpose of permitting a determination whether a person who committed a serious or violent crime between the age of 18 and 25 has sufficiently matured and outgrown the youthful impulses that led to the commission of the offense, an individual serving a parole-eligible life sentence and a person who committed an offense at the same age serving a sentence of life without parole are similarly situated. (*People v. Acosta*, *supra*, 60 Cal.App.5th at p. 779; cf. *In re Williams*, *supra*, 57 Cal.App.5th at p. 435 [As between "youth offenders sentenced to LWOP and those sentenced to a parole-eligible life terms," "one could say that both groups committed their crimes before their prefrontal cortexes reached their full functional capacity, when their characters were

18

not yet fully formed.  Both groups are equally likely to demonstrate improved judgment and decisionmaking as they reach emotional and cognitive maturity"]; cf. *People v. Miranda*, *supra*, 62 Cal.App.5th at p. 183, review granted [individual convicted of committing murder when under the age of 26 and sentenced to parole-eligible life sentence and individual convicted of committing a one strike offense at the same age are similarly situated for purposes of section 3051]; see generally *Miller*, *supra*, 567 U.S. at p. 473 [none of the distinctive and transitory mental traits and environmental vulnerabilities of youth offenders "is crime-specific"]; but see, e.g., *People v. Jackson* (2021) 61 Cal.App.5th 189, 199 [youthful offenders between the ages of 18 and 25 who committed first degree murder are not similarly situated for purposes of section 3051 with same-age individual convicted of special-circumstance murder].)

> c. *There is no rational basis for distinguishing between young adult offenders sentenced to life without parole and other young adult offenders for purposes of section 3051*

We acknowledge the broad deference properly accorded legislative decisionmaking under rational basis review.  (See *Johnson v. Department of Justice*, *supra*, 60 Cal.4th at p. 881 ["[i]f a plausible basis exists for the disparity, courts may not second-guess its "'wisdom, fairness, or logic'""].)  Nonetheless, if, as the Legislature stated, the goal of section 3051 was to apply the *Miller* youth-related mitigating factors to young adults up to the age of 26 in light of neuroscience research that demonstrated the human brain continues to develop into a person's mid-20's, and thus to permit youth offenders a meaningful opportunity for parole if they demonstrate increased maturity and impulse control, then for that purpose there is no plausible basis for

19

distinguishing between same-age offenders based solely on the crime they committed.  (See *Miller*, *supra*, 567 U.S. at p. 473.) The potential for growth and rehabilitation is no greater for the 19-year-old offender who committed a robbery one day and an unrelated premeditated murder the next, for example, than for the 19-year-old offender who killed his or her victim during the robbery, a homicide offense that does not necessarily require proof of actual malice (see §§ 188, subd. (a)(3), 189, subd. (e)(1), (3)).  The nature of their crimes does not provide any indication either perpetrator can properly be deemed at the time of sentencing to be "irreparably corrupt, beyond redemption, and thus unfit ever to reenter society," as the Supreme Court in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391, described the implied finding and necessary consequence of a life without parole sentence.

The courts that have rejected an equal protection challenge directed to section 3051's disparate treatment of young adult offenders sentenced to life without parole and those with parole-eligible indeterminate life terms have focused on the Legislature's prerogative to distinguish crimes by degree of severity and "assign them different punishments based on its view of the crimes' comparative gravity and on policy objectives like deterrence, retribution, and incapacitation."  (*People v. Sands*, *supra*, 70 Cal.App.5th at p. 205.)  It is not irrational under this view for the Legislature to single out special-circumstance murder and to deny any possibility of parole to nonjuvenile offenders who commit it.  (*In re Williams*, *supra*, 57 Cal.App.5th at p. 436 [the Legislature rationally judged the petitioner's crime of special-circumstance murder to be more severe and deserving of lifetime punishment than nonspecial

20

circumstance first degree murder]; accord, *People v. Acosta*, *supra*, 60 Cal.App.5th at p. 780; *Sands*, at p. 205.)

We have some difficulty with the premise that assessing relative culpability has a proper role in a statute expressly intended to recognize the diminished culpability of youthful offenders based on their stage of cognitive development. But even accepting that proposition, this superficially plausible justification for excluding offenders under age 26 sentenced to life without parole from eligibility for youth offender parole hearing is belied by the statutory provisions that allow such a hearing for individuals who have committed multiple violent crimes (albeit not special-circumstance murder) and were sentenced to a technically parole-eligible indeterminate state prison term that is the functional equivalent of life without parole. (Cf. *People v. Caballero*, *supra*, 55 Cal.4th at p. 268 [sentence of 110 years to life for three counts of attempted premeditated murder with firearm-use and criminal street gang enhancements "amounts to the functional equivalent of a life without parole sentence"]; *id.* at pp. 271-272 (conc. opn. of Werdegar, J.) ["the purported distinction [proposed by the Attorney General] between a single sentence of life without parole and one of component parts adding up to 110 years to life is unpersuasive"].) The crime of a 20-year-old offender who shot and killed his victim while attempting to commit robbery and was sentenced to life without parole (see § 190.2, subd. (a)(17)(A)) cannot rationally be considered more severe than those of a 20-year-old who shot and killed his victim one day, committed a robbery the next, and was sentenced to an indeterminate term of 50 years to life (see §§ 190, subd. (a), 12022.53, subd. (d)), or who committed multiple violent crimes, like Caballero, and received a parole-eligible indeterminate life

21

term that far exceeded his or her life expectancy.[10]  By defining the youth parole eligible date in terms of a single "controlling offense," rather than by the offender's aggregate sentence, the Legislature has eschewed any attempt to assess the offenders' overall culpability, let alone his or her amenability to growth and maturity.

Even with respect to first degree murder, any purported legislatively recognized distinction in culpability between individuals serving a parole-eligible indeterminate life sentence and those sentenced to life without parole is illusory.  The Committee on Revision of the Penal Code in its 2021 Annual Report and Recommendations (2021 Report), citing recent research,[11] explained that expansion of the factors qualifying as special circumstances from the original list of seven in the 1970's[12] to the current number in excess of 20 (§ 190.2,

---

[10]      A sentence exceeding the defendant's expected lifetime, as in *Caballero*, but for which the defendant would be eligible for a youth offender parole hearing, is far from anomalous.  A gang member who shot two rivals—sadly, not an unusual set of events—faces a potential sentence of 80 years to life even though neither victim died.  And in a nongang setting, a paradigmatic "botched" robbery in which two of the victims were seriously injured after being shot by the perpetrator could result in an aggregate indeterminate sentence of at least 70 years to life.

[11]      The Committee cited Baldus et al., *Furman at 45: Constitutional Challenges from California's Failure to (Again) Narrow Death Eligibility* (2019) 16 J. Empirical Legal Stud. 693. (2021 Report, *supra*, at p. 51.)

[12]      "[S]pecial circumstances were added to the murder laws in the 1970's to conform California's death penalty law to the

subd. (a)(1)-(22)) meant special-circumstance allegations could have been charged in 95 percent of all first degree murder convictions, leaving the decision whether a life without parole sentence may be imposed to the discretion of local prosecutors, rather than a matter of statewide policy. (2021 Report, at p. 51.)[13]

In sum, while for some purposes it might be reasonable to view special-circumstance murder differently from murder with no special-circumstance finding, that is not a rational basis for the distinction in eligibility for a youth offender parole hearing made by section 3051.

Nor is this simply a question of the statutory classification being "imperfect" or somewhat under- or overinclusive. (See *People v. Sands*, *supra*, 70 Cal.App.5th at p. 205; see generally *Johnson v. Department of Justice*, *supra*, 60 Cal.4th at p. 887.)

---

requirements of the United States Constitution." (*People v. Anderson* (2002) 28 Cal.4th 767, 775.)

[13] The Committee recommended all life without parole sentences be reviewed for resentencing after the inmate has served 25 years. (2021 Report, *supra*, at p. 50.) In support of its recommendation the Committee observed that "life without parole sentences do not result in any greater public safety benefits than life with parole sentences," citing an empirical study published in 2020 (*ibid.*), and noted that 79 percent of individuals serving life without parole sentences in California (and 86 percent of those 25 years old or younger) are people of color, "suggest[ing] that inappropriate factors may be playing a role in who receives this sentence." (*Id.* at pp. 50, 53.) Similar research, the Committee continued, found that individuals accused of killing White people were more likely to be charged with a special circumstance. (*Id.* at p. 51.)

While we must accept any gross generalizations the Legislature may seem to have made when conducting rational basis review (see *People v. Turnage* (2012) 55 Cal.4th 62, 77 ['[a] classification is not arbitrary or irrational simply because there is an 'imperfect fit between means and ends'"]), the exclusion of young adult offenders sentenced to life without parole was a deliberate and focused choice, not an inadvertent consequence of broadly worded legislation.

Finally, we reject the Attorney General's suggestion that we should uphold section 3051's disparate treatment of young adult offenders sentenced to life without parole based on the general principle that, when addressing a problem, the Legislature may choose to proceed incrementally. (See *FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 316 ["the legislature must be allowed leeway to approach a perceived problem incrementally"]; *People v. Barrett*, *supra*, 54 Cal.4th at p. 1110 ["[n]othing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all'"].) Although the Legislature may adopt reform measures in steps "without necessarily engaging in arbitrary and unlawful discrimination" (*Barrett*, at p. 1110)—as it did, for example, when it first expanded section 3051 to young adults under 23 years old—there still must be some rational basis for the choices made. (See *Young v. Haines* (1986) 41 Cal.3d 883, 900 [there must be "some rational relationship between the legislative goal and the class singled out for unfavorable treatment"]; *People v. Miranda*, *supra*, 62 Cal.App.5th at p. 186, review granted ["an incremental approach may be constitutionally sufficient, at least where there is a rational basis for the manner in which the Legislature has proceeded to address different dimensions or proportions of a

problem"]; see generally *Pearce v. Commissioner* (1942) 315 U.S. 543, 558 (dis. opn. of Frankfurter, J.) ["the fact that a line has to be drawn somewhere does not justify its being drawn anywhere"].)

The Legislature has recognized that the distinctive attributes of youth, as articulated in the United States Supreme Court's decisions in *Miller*, *supra*, 567 U.S. 460 and *Montgomery*, *supra*, 577 U.S. 190, justify providing most individuals convicted of committing violent crimes when they were under 26 years of age with a meaningful opportunity for parole through a youth offender parole hearing. Yet similarly situated young adult offenders sentenced to life without parole are categorically denied the same right. Absent a rational basis for that exclusion, the disparate treatment of offenders like Hardin cannot stand.

## DISPOSITION

The order denying Hardin's motion for a *Franklin* hearing is reversed. The cause is remanded with directions to schedule the hearing and to conduct all appropriate further proceedings not inconsistent with this opinion.


PERLUSS, P. J.

We concur:


SEGAL, J.


FEUER, J.

25